We want to welcome Judge Sanis of the Northern District of New York. We're grateful for her helping us out today. We'll hear the first case, New York Times v. Newspaper and Mail Deliverers. May it please the court, Iakov Roth for the New York Times Company. I'd like to start with the threshold issue of whether the Times partially withdrew from the pension fund in the first place. And the dispositive question there is this sort of narrow and almost one-off question of whether the Times contributes to the fund based on shifts or based on pay. And here's our basic point about that. When an employee works a shift and is paid a wage for that shift, it's impossible to fund is based on the shift or based on the wage because the two go hand-in-hand. One is just a function of the other. So in order to determine whether it's the shift or the wage that is giving rise to the contribution, the court really needs to practice the folks who implemented this. Did they not use the shift method? No, Your Honor. I thought the testimony was that that's how they calculated it over the years. I'm not sure if Your Honor is referring to in terms of implementation, whether you're referring to the people at the Times who made the contributions or anyone else. There's actually no dispute between the parties as to the contribution obligations, meaning how much the Times owes in any particular situation. The question really in the case is about how to characterize the base for purposes of ERISA. So it doesn't actually have any practical implications for the calculation. But in the course of figuring out how much is owed, there needs to be a methodology. Right. So Your Honor, for ordinary shift-based work, there's no difference because you're either taking 8% of the wage, of the pay, or you're taking 8% of the per shift wage, multiplying it by the number of shifts. That doesn't result in any different number at the end of the day. So that's what I'm trying to articulate, is in order to determine whether it's the shift or the wage that's making the difference, you need to look at the few situations where those two things are not linked, and then you can tell whether the contribution follows the shift or follows the pay. But the CEA itself is phrased in terms of shifts. I mean, if you're correct, why does it have to make any mention of shifts at all? Well, Your Honor, there are different parts of the CBA. The obligation to contribute to the pension fund seems critical, and it refers to shifts. Why is that even necessary? So Your Honor, just to be clear, there's multiple parts of the CBA that bear on the pension obligation. The language that relates to the obligation for ordinary shift-based work has three components to it. It refers to 8%, the pay rate per shift, and the number of shifts. And the problem here is that ERISA contemplates two factors, a base and a rate. And so the problem we have is whether we can combine the first two aspects of the formula or the second two aspects of the formula in applying ERISA. Now, there's no question the CBA could have been written in a way that would have made this an easier case. It could have said 8% of wages. That would have been easier. That would have brought together a number of the different— Your Honor, it's 8% of each employee's pay rate per shift. The pay rate per shift is a dollar amount per shift for each shift work by each employee. If we take— You need to look at how many shifts there are. Right. And if you take— Under the plain language here, it seems to me you need to look at how many shifts there are. Your Honor, that's—you have to—yes, that's true for shift-based work. Our point is if you take 8% of the pay rate per shift multiplied by the number of shifts, that works out to 8% of wages. Now I realize this language— Any unit is going to turn into wages in the end because we don't get paid in widgets. Well, that's true for this provision, and that's why I keep turning back to these other situations like workers' compensation and the foreman because those are situations where the two are not linked. But those are covered—go ahead. Please, go ahead. Those are covered by additional language, so that doesn't really impact the analysis on the first part, that is for employees in the bargaining unit because there's a separate sentence that deals with workers' comp. That's correct. And in order to determine what the contribution base unit is— But in terms of analyzing the first sentence, it's not particularly helpful to refer to workers' comp because that's covered by the next sentence. And, Your Honor, our point is the first sentence standing alone is indeterminate about what the rate is versus what the base is because it can be articulated in two different and equal ways. But even the cap is also articulated in terms of shifts, right? The cap is— Not in excess of five shifts. That's right, which is the overtime. And so it's either non-overtime shifts or non-overtime pay that works out to be the base. I don't— Was the arbitrator wrong when he found that the CBA and the pension plan were really based on a shift-based structure? The pension plan is, yes. And so for pension credit, he's not wrong about that, but that's not what ERISA defines the CBU to turn on. ERISA defines it to turn on the obligation to contribute. And I think—I don't want to belabor this because I want to move on to the second issue, but I just would say the fund doesn't have an explanation for how the workers' comp obligation and the foreman obligation can be articulated in terms of shifts. It just—they can't. They're 8% of the workers' comp pay. They're 8% of the foreman's salary. There is no shift-based account of those obligations, and that's what we think breaks the tie in terms of the indeterminacy of the first provision. In terms of the use of the SIGL? Yes. So let me turn to that. Yeah. The statute says that you have to use the actuary's best estimate of anticipated experience. In here, the actuary testified that her best estimate was 7.5%. Correct. And that's what Judge Sweet relied on in . . . Why is that wrong? No. That's right. We're defending that. Okay. So we—our point is 7.5% is the best estimate. That is what she testified. She testified that the SIGL blend was lower than her best estimate of anticipated experience. That's page 196 of the appendix. She made a determination that it was reasonable—actuarially reasonable to apply a different rate for the minimum funding liability than for the withdrawal liability. Correct. She did. And Judge Sweet focused on the best estimate language, but we have the—it seems to me the question is what is actuarially reasonable in the aggregate here, and that we would have, in generally, an obligation to defer to the actuary in assessing a different rate for with minimum funding liability from withdrawal liability, and that that's—and even though there's some language in concrete pipe that suggests that a differential rate imposition would be subject to question, we still have an obligation to defer to the arbitrator on this. Why was it . . . It's not something that we can defer to. Okay. So let me say two things. First of all, we have two different arguments. One is the concrete pipe argument, which turns on consistency, and I don't think it's fair to say the Court just suggested it. The Court said that the interest rate must be used for other purposes as well, and that there is a necessity . . . It's talking about—it was still talking not about what must be used, but about the restrictions on arbitrary exercise of discretion by the actuary, and distinguishing that from the trustees. It was like why the actuaries aren't subject to the conflict charges that the . . . Right. . . . have been . . . That's right. And the Court said what keeps them honest is, quote, the necessity for applying the same assumptions and methods in more than one context, and then specified minimum funding. So that, I think, the Supreme Court decision is clear that they have to be the same. But apart from that, and the other restraint that Judge Sweet focused on, is the statutory requirement that it be—the assumptions not only be reasonable, but also reflect the actuary's best estimate of anticipated experience under the plan. And the actuary testified at the hearing that this Siegel blend does not reflect her best estimate of anticipated experience under the plan. And you reject—you reject the proposition that a different estimate of risk is appropriate in light of the differential purposes between minimum funding liability and a single withdrawal payment. You reject that. Well, that's the actuarial theory. It's an actuarial theory that doesn't comport with the statute. So, you say that's unlawful. Correct. And that's what this Court said in Wachtell, where it said that factoring in a discount for conservatism after an actuary has arrived at his or her best estimate of anticipated experience would be contrary to the statutory mandate. That is what the actuary here admitted that she did. She took her best estimate of anticipated experience under the plan, 7.5 percent. She then took PBGC rates, which she admitted do not reflect anticipated experience under the plan in any way, blended them together in order to get a reduced rate. That had the effect of a 33 percent inflation of the liability amount. But if I were to say that it seems to me that different risks calculations might be appropriate given the different functions of the two funding requirements, and as reflected in longstanding practice applying the Siegel blend. So what exactly in the statute makes that unlawful? So the statute requires that the assumptions reflect the actuary's best estimate. Point me to the section. Yeah. It's 1393A. It refers to best estimate of anticipated experience under the plan. And even if you think there could be a different method of getting there for withdrawal liability as for minimum funding, the statute is telling the actuary what she is supposed to be measuring. Now, she has lots of discretion in how she goes about projecting that. These projections are not scientific. There's a lot of discretion. Even if we disagree with your reading of the case, that the same rate has to be used? Yes. You still win. Correct. Correct. The district court didn't rely on concrete pipe. He said it presumptively should be the same. But regardless, at the end of the day, this is what the statute says the actuary has to do. She admitted she didn't do it. It had a 33 percent increase. If that does not make the assumptions unreasonable in the aggregate, it's hard to see what would. Looking at the statutory language, it says best estimate of anticipated experience under the plan. Isn't that broader than expected returns? Well, it's broader in the sense that that language governs all of the assumptions. So it depends on which assumption you're talking about. If you're talking about retirement age, we're supposed to project what ages are these people going to retire at. If you're talking about mortality, we're looking at how long do we think they will live. If we're talking about interest rate, then we're looking at what is the return likely to be that the plan experiences. And in fact, that's how the actuary herself interpreted the phrase. That's why she admitted that she had gone below it, below the anticipated experience under the plan. That's even what the funds expert admitted, because he said in his view we should be adjusting the anticipated experience under the plan as a result of the special situation of withdrawal. Well, that's not what the statute says. My understanding is that the Siegel blend has been very widely used in multi-employer pension plans, and your position would be that's all illegal. Is that correct? Yes, Your Honor. I mean, there may be a situation where, look, I think the district court left open the possibility that maybe there would be some situation in which it could be justified. But here... You're saying the statutory language doesn't permit it. So I mean, the implications of your position, I think, are that for 20 years, 25 years, however long the Siegel blend has been used by hundreds of multi-employer plans, that that has been unlawful. I do agree with that. I also think that the district court's opinion was narrower in the sense that he really did focus on the testimony in this case and the actuary's admissions in this case. But your position is no, the statute doesn't permit it, and therefore that's unlawful across the country. I certainly believe that is true. I think we still win regardless because of the particular testimony in this case. I would also say there hasn't been a case that has directly challenged the Siegel blend in any of that time. No court has weighed in on its legality. So the fact that it's been done for a long time... There may be cases where the Siegel rate is the best estimate. Yeah. I mean, the actuary could come in and give different testimony. All right. Yes. Do you have some time for rebuttal? Thank you very much, Your Honor. May it please the Court. Ronald Richmond for the Newspaper and Mail Deliverers Pension Fund. With respect to the contribution unit issue, as was said previously, the contribution obligation for workers' comp is in the same paragraph in the Collective Barney Agreement that sets out the contribution obligation being per shift. And so workers' comp is covered by the per shift obligation. Now it is true that the contract talks about shifts worked, but there has been an extraordinary amount of testimony, including the annual auditor's report about shifts worked included because of other provisions in the Collective Barney Agreement, shifts that were not worked but for which contributions were necessary. How are we to deal with the inclusion of salaried workers and the workers' comp payments where there were no shifts worked? How does that fit into your... Because the way the contract is set up, like many other Collective Barney Agreements, when a worker is out a shift or out a day or out a week of workers' comp or otherwise, there are still contributions necessary. It's not required that... Those aren't based on shifts though, right? They are based on shifts, the shifts that would have been worked. That's correct. And the salaried workers, it's never based on shifts. Well, first of all, the salaried workers are only the foremen and they are a special category. And the fact is that the terms and conditions of employment generally, particularly the salary, but other terms and conditions of employment are made outside of the Collective Barney Agreement. They are made between the New York Times... The language in the Collective Bargaining Agreement about the foreman? There is reference to the foreman in the Collective Barney Agreement and it's in Section 6 and it talks about foreman and it talks about the shifts they worked. They work. And it talks about a night and day shift. There is also in the Collective Barney Agreement in Section 6, it talks in a different part of Section 6, it talks about the foreman not working more than a certain number of regular days or regular nights. Well, in the Collective Barney Agreement, a regular day or a regular night is a shift as defined in paragraph 5 of the Collective Barney Agreement. One of the arguments made by the Times is that given all these different shifts, it's difficult to make the calculations. Well, they've been doing it this way for decades and those calculations have to be made in order for pension credit to be awarded because pension credit is only awarded per shift. And so every contribution that comes in, even the one for the foreman based on salary, even though the contract talks about the foreman working shifts, must be converted into shifts so that pension credit can be provided. And that's not unusual among pension plans where you might have some either union folks working and participating in the pension plan or have others, even some management people, working and participating in the pension plan. So when you say this is the way it's been done for decades, the folks who actually do the numbers do it by looking at the shifts? Absolutely. And there is an enormous amount of testimony. And probably one of the many pieces of testimony that the arbitrator heard was about a discussion that was had at a trustees meeting. That discussion involved newspaper El Diario and the question was, how do we determine whether there is a partial withdrawal? And the Siegel folks, who were the actuaries, said, in order to do that, we've got to look at, we've got to go back and look at the contribution base units. Now there's some disputed testimony about whether the New York Times representative, who is a trustee of the fund, was at that meeting. But the reality is, he signed the minutes of the meeting that specifically said in order to calculate a partial withdrawal liability, we need to have the contribution base units. And as I also mentioned, the audited financial statement, since 2004, talks about shifts worked and not worked. That is, the contributions are due for both. There's even a letter in evidence from a former Times director of labor relations who recognized the shifts as the contribution base units. Let's move on to the second question. Okay. My question actually was intended for you, and that is, the actuary's testimony that her best estimate of anticipated experience was 7.5%. So how do you get around the language of the . . . Well, that was half of her testimony, and it's unfortunate that the judge in the district court decided to cite that as her testimony, because the reality is, her . . . She says it several times. She says 7.5% for calculating minimum funding, where it was important to look at the long-term return of the portfolio of the fund. She also says . . . Her argument is that 7.5% was not her best estimate? In fact, and she said it. She said it . . . Where in the record are you? I'm at page . . . I can't see. It's Fund Appendix 29. And what happens is . . . This is a question. You use the Siegel blend to calculate withdrawal liability for all of the multi-employer funds for which you serve as an actuary, correct? Yes, as my best estimate. And I believe it appears in evidence in other places as well. What she said is she's got two best estimates. Different ways, then isn't it up to the finder of fact to decide which is the correct way? I think what we need to focus on is that she said for doing withdrawal liability calculation, her best estimate is using the Siegel blend. For doing a calculation for minimum funding, her best estimate was using 7.5%. The Siegel blend yielded, as a result, 6.5%. And the reason that she is able to have two best estimates is that the two calculations are for two different purposes. And when you look at the actual standards of practice, particularly 27, you see that the actuary is supposed to take a look at the purpose of the calculation. But the statutory phrase, best estimate of anticipated experience under the plan, doesn't identify for a particular purpose. It's just that one phrase. That is correct, but it's used in two different sections of ERISA. Not only two different sections, but two different parts and two different titles, and for two different purposes. And there's Supreme Court case law that we've cited in our briefs that talk about when the same or similar language is used, even in the same section. If it's used for different purposes, it doesn't have to yield the same result. The reality is also that after the concrete pipe case in 2006, the ERISA was amended. And in that amendment, what Congress did is say that for minimum funding purposes, each individual assumption needed to be reasonable. And with respect to calculating withdrawal liability, Congress didn't change that. So for withdrawal liability purposes, you're looking at all of the assumptions in the aggregate. So you're saying the actuary has a different charter with regard to funding, to calculating minimum liability, or minimum funding levels and withdrawal liability. Yes, and the reason is that they're measuring two very different things. That Congress recognized that and it's expected. It's odd that they used the same statutory language. Well, they did, but it's in there for different purposes. And in 2006, they in fact changed that language. It's also interesting that the Times is, depending on this argument, that the assumptions were incorrect as a matter of fact, because they refused to let their expert actuary testify as to whether 6.5%, which was the effective rate after the application of the Siegel blend, was an appropriate assumption. Because they said their argument was based on the fact that the rates had to be the same. And it is also telling, when you look at the statute, there is no discussion about, no mention of long-term investment rate, no mention of investment rate, or anything of that sort. It uses very broad general language to permit actuaries. The testimony, and this is at the other appendix at 196, the question is, the resulting effective investment return assumption by applying the Siegel blend was lower than your best estimate of the future anticipated experience of this plan over the long term. And the actuary's answer was yes. And it was in the context of talking about the investment return on the portfolio that the plan had. And that's not what the best estimate is for using, or choosing an assumption for withdrawal liability purposes. She made it crystal clear that her best estimate for withdrawal liability purposes was something different than her best estimate for minimum funding purposes. And we also have to take into account that what the times failed to show is that a reasonable actuary would not use the Siegel blend. In this case or other cases. That was its obligation. The presumption is in favor of the fund's calculation. And as Concrete Pipe set out in its opinion, very clearly, that the burden of the employer is to show that a reasonable actuary would not use the assumptions that were used. And the times did not do that. Thank you. We'll hear the rebuttal. Answering that, did you show that a reasonable actuary would not use the Siegel blend, or did you not have to? No, we didn't have to. I mean, actuaries do use the Siegel blend. They do. I mean, that's undisputed. However, what we had to show was that this actuary did not use her best estimate of anticipated experience under the plan. That's what the statute requires. Do you disagree with the reading of the transcript that we've just had, that she was speaking about best estimate in one circumstance? The question literally just used the statutory language. That was the question, the question was, is this lower than your best? Was the context withdrawal liability? No, the question was about, no, the question was about the Siegel blend. We're discussing the Siegel blend, and the question was, was the rate- The question was back to, I mean, to where she says, yes, 7.5% is my best estimate. Was that about withdrawal liability? I'm not sure which excerpt that is at. The question that we've, the excerpt we've been talking about of 196 is where the question was phrased in terms of the statutory language and the Siegel blend. Right, 196, my question is, is that in the context of withdrawal liability? Yes, yes, that was what, we were talking about the Siegel blend, that was what the question was about. She only uses the Siegel blend for withdrawal liability, and the question was, does that get you lower than your best estimate of the plan's future experience? She said yes, and of course it is, because the PBGC rates have nothing to do with the plan's anticipated experience. What about testimony in the fund's appendix at 29? Yeah, so that's interesting. You'll notice that when the fund and when the funds council refers to it, they refer to, is it your best estimate? Best estimate of what? Okay, yes, she thinks it's her best way of, she thinks it's the great way to do withdrawal liability. But when you ask her, is it the way that the statute tells you to do it? She says no, it's not. She thinks it's a great way to do it, their expert thinks it's a great way to do it, it's not what the statute says, she admitted that. What's your response to the fund's argument citing the Wachtell-Lipton case? Where this court said, we believe the best estimate requirement is basically procedural in nature, and is principally designed to ensure that the chosen assumptions actually represent the actuary's own judgment, rather than the dictates of plan administrators or sponsors. So, we agree with that. The test is, was this actuary actually giving you her best estimate of anticipated experience? In other words, we're not saying that six and a half is necessarily bad, that's why we didn't provide evidence on that. Six and a half may be great if the actuary came in and said, my best estimate of the plan's future anticipated experience is six and a half. She didn't, she didn't say that. And in fact, Wachtell then goes on to say, if you develop your best estimate and then you discount it to be more conservative, that violates the statute. And it violates the statute in this case, in a way that had multi-million dollar effect on the outcome. That's got to be unreasonable in the aggregate. Just quickly on the CBU issue, if I can. You can have 30 seconds. Okay, thank you. For workers' compensation informant, I think those are the two keys to understanding this puzzle. The workers' compensation contributions are based on historical earnings. They are not based on shifts. If you look at the record, that is clearly what it shows. It's been undisputed the entire time. For foreman, the fund says foreman work shifts. Yes, they work shifts. They're not paid based on shifts. And the contributions for their work is therefore not based on shifts. It's based on their earnings. And that's why when you look at all of the obligations as a whole- How do they qualify? How do they become eligible? Yes, for pension crediting purposes, they look at their shifts. For pay and for contributions, they do not look at the shifts. They look at their compensation, 8%. And that is why the 8% of pay formulation is what reconciles all of the obligations and is therefore the correct answer to this question as a matter of law. Thank you. Thank you, your honors. We'll reserve decision. We'll